IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| Amy C. Forrester, | ) | C/A No.: 1:12-2111-JMC-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration,[1] | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be affirmed.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Fed. R. Civ. P. 25(d), Carolyn W. Colvin is substituted for Commissioner Michael J. Astrue as the defendant in this lawsuit.

I.     Relevant Background

A.     Procedural History

On November 24, 2008, Plaintiff filed an application for DIB in which she alleged her disability began on November 2, 2001.  Tr. at 99.  Her application was denied initially and upon reconsideration.  Tr. at 47, 49.  On July 8, 2010, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Edward T. Morriss.  Tr. at 31–46 (Hr'g Tr.).  Prior to the hearing, Plaintiff amended her alleged onset date to November 2, 2007.  Tr. at 16, 123.  The ALJ issued an unfavorable decision on August 24, 2010, finding that Plaintiff was not disabled within the meaning of the Act.  Tr. at 16–26.  Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review.  Tr. at 1–3.  Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on July 27, 2012.  [Entry #1].

B.     Plaintiff's Background and Medical History

1.     Background

Plaintiff was 40 years old at the time of the hearing.  Tr. at 34.  She graduated from high school and earned associate degrees in early childhood education and certified medical assisting.  Tr. at 179.  Her past relevant work ("PRW") was as a medical assistant, elementary school teacher's aide, preschool teacher, clerk/cashier in a parts store, assistant manager, and retail sales clerk.  Tr. at 534.  She alleges she has been unable to work since November 2, 2007.  Tr. at 16.

2.    Medical History

Plaintiff has a history of undergoing a cervical spine discectomy and fusion in August 2002 following a motor vehicle accident in November 2001.  Tr. at 197–205. Postoperative cervical spine x-rays revealed satisfactory position and alignment of orthopedic hardware without evidence of hardware complication or movement (Tr. at 209–11), and a cervical spine magnetic resonance imaging ("MRI") revealed no evidence of focal disc herniation or central canal stenosis (Tr. at 214–15).  Lumbar spine imaging in December 2003 revealed mild degenerative disc disease at the L3–4 and L4–5 levels and mild to moderate facet joint osteoarthropathy at the L4–5 level with resulting mild to moderate lateral recess stenosis on the right side at that level.  Tr. at 219.  The imaging revealed no evidence of gross disc herniation or significant nerve root compression.  *Id.* A lumbar spine MRI in January 2005, ordered by Leonard E. Forrest, M.D., of Southeastern Spine Institute ("Southeastern Spine"), revealed mild degenerative disc changes with mild loss of disc signal, mild annular bulging, and possibly a small annular tear at L3–4 and L4–5.  Tr. at 281–82.  On April 26, 2005, Mark Netherton, M.D., performed a discogram on Plaintiff to address her lumbar radiculitis and lumbar disc disorder.  Tr. at 287–88.

Providers at Summerville Family Practice ("Summerville Family") examined Plaintiff on December 11, 2007, for complaints of back pain and of shooting pain and numbness in her legs and feet.  Tr. at 232.  Plaintiff reported that her pain started a couple of months prior to the visit, but became intolerable in the preceding month.  *Id.* Examination revealed negative straight leg raise testing bilaterally and good hip ranges of

motion.  *Id.*  Providers prescribed medication and referred Plaintiff for orthopedic examination.  *Id.*

Dr. Forrest examined Plaintiff in January 2008 for complaints of back pain and weakness and pain in her legs.  Tr. at 275–77.  Plaintiff reported that she began experiencing these symptoms during the spring of 2007 while working at Doctors Care.  Tr. at 276.  She then took off work for about three months and subsequently worked at Berkeley Family Practice for seven weeks.  *Id.*  She indicated that she had to quit that job because her symptoms were getting worse and worse.  *Id.*  Examination revealed back and buttock tenderness, but no definitive weakness.  *Id.*  Dr. Forrest noted that Plaintiff had mild spinal degenerative changes and significant disc protrusions superimposed on degenerative discs at L2–3, L3–4, and L4–5.  Tr. at 277.  Plaintiff reported that she was going on a trip the following week and requested pain medication.  *Id.*  Dr. Forrest prescribed what he characterized as a mild pain medication.  *Id.*

Lower extremity electrodiagnostic studies on February 20, 2008, were normal and revealed no evidence of radiculopathy.  Tr. at 278–79.  Dr. Forrest noted that Plaintiff's symptoms were likely coming from her back, but on the basis of radiculitis.  Tr. at 279.  He further noted that he would recommend avoiding surgery because (1) there was no evidence of radiculopathy and (2) Plaintiff had a multilevel condition.  *Id.*  Dr. Forrest discussed doing an injection procedure, but Plaintiff indicated that she received no significant benefit from them in the past.  *Id.*  He referred Plaintiff to Dr. Netherton of Palmetto Pain Management ("Palmetto") for a procedure that Plaintiff had responded favorably to in the past.  *Id.*

Plaintiff was examined by a nonphysician provider at Palmetto in February 2008 for back and lower extremity pain. Tr. at 366. Examination revealed an abnormal gait, but also that Plaintiff was well groomed and demonstrated a normal affect, normal memory, normal lower extremity deep tendon reflexes, normal lower extremity muscle strength, and negative straight leg raise testing. *Id.* Plaintiff was assessed with lumbar radiculitis and lumbar degenerative disc disease. *Id.*

Plaintiff received a lumbar spine epidural steroid injection by Dr. Netherton on March 3, 2008. Tr. at 286. Subsequent examinations by a nonphysician provider at Palmetto in March and April 2008 revealed an abnormal gait, but also that Plaintiff was well groomed and demonstrated a normal affect, normal memory, normal lower extremity deep tendon reflexes, normal lower extremity muscle strength, and negative straight leg raise testing. Tr. at 364–65.

Plaintiff received a lumbar spine medication injection by Dr. Netherton on April 28, 2008. Tr. at 378.

A provider at Summerville Family examined Plaintiff on May 2, 2008, for complaints of chronic neck and back pain, depression, irritability, insomnia, and migraine headaches. Tr. at 230. Examination revealed a tearful affect, but the absence of thought disorder. *Id.* The provider provided a sample of psychiatric medication. *Id.*

Examination by a nonphysician provider at Palmetto on May 20, 2008, revealed an abnormal gait, but also that Plaintiff was well groomed and demonstrated a normal affect, normal deep tendon reflexes, normal lower extremity muscle strength, and negative

straight leg-raise testing.  Tr. at 363.  Plaintiff reported that a medication injection was somewhat effective.  *Id.*

Plaintiff received a lumbar spine median branch nerve rhizotomy by Dr. Netherton on May 23, 2008.  Tr. at 284–85.

Examinations by Dr. Netherton and a nonphysician provider at Palmetto in June 2008 revealed an abnormal gait, but also that Plaintiff was well groomed and demonstrated a normal affect, normal memory, and normal motor functioning.  Tr. at 361–62.  Plaintiff reported that she had felt no relief since her rhizotomy and that medications were minimally effective.  *Id.*

Upon return to Summerville Family in July 2008, Plaintiff reported overall mental improvement, but increased irritability and insomnia.  Tr. at 229.  In August 2008, Plaintiff reported almost-daily cervical pain, increased headaches, and increased anxiety, but no depression.  Tr. at 228.  Plaintiff stated that her left leg radicular pain had resolved since her rhizotomy.  *Id.*  On examination, she demonstrated increased occipital tenderness.  *Id.*  The provider discussed the possibility of a cervical spine MRI if Plaintiff had no improvement with her altered medications.  *Id.*

In August 2008, Plaintiff presented to Palmetto complaining of low back pain, leg pain, and chronic headaches.  Tr. at 360.  Examination by a nonphysician provider revealed that Plaintiff had an abnormal gain, but a normal affect, normal memory, and normal lower extremity muscle strength.  *Id.*

A lumbar spine MRI in August 2008, ordered by Dr. Netherton, revealed minimal noncompressive abnormalities.  Tr. at 384.

Plaintiff presented to the Summerville Medical Center emergency room ("ER") on September 4, 2008, for complaints of back pain. Tr. at 344–49. Examination revealed vertebral point tenderness over the mid and lower lumbar spine, but no neck or extremity tenderness and normal extremity ranges of motion. Tr. at 345. Providers treated Plaintiff with medication and discharged her in stable condition with a pain level of six out of 10. Tr. at 346.

Plaintiff received a lumbar spine medication injection by Dr. Netherton in September 2008. Tr. at 375. Subsequent examinations by Dr. Netherton and a nonphysician provider at Palmetto in September 2008 revealed an abnormal gait, but also that Plaintiff was well groomed and demonstrated a normal affect, normal memory, and normal lower extremity muscle strength. Tr. at 358–59. Dr. Netherton noted that he was concerned about the validity of Plaintiff's complaints. Tr. at 358. Plaintiff reported that oral medication and a medication injection were somewhat effective. Tr. at 358–59.

Charles Kelly, M.D., a neurologist, examined Plaintiff on October 8, 2008, for complaints of low back pain, pain and numbness in her legs and feet, and pain in her left arm. Tr. at 222. Examination revealed severe low back tenderness and positive straight leg raise testing, but also normal muscle strength, sensory functioning, and gait. Tr. at 223. Dr. Kelly diagnosed low back pain and cervical myelopathy. Tr. at 222.

A cervical spine MRI on October 29, 2008, ordered by Dr. Netherton, revealed no evidence of residual or recurrent nerve root compression. Tr. at 224–25.

In November 2008, Plaintiff reported increased stress, marital difficulties, and increased pain to providers at Summerville Family. Tr. at 227. Examination revealed an abnormal affect, and Plaintiff was noted to be stressed. *Id.*

Plaintiff presented to William Blane Richardson, M.D., of Palmetto in November 2008, complaining of low back and neck pain. Tr. at 357. Examination revealed that Plaintiff was well groomed and demonstrated a normal affect, normal memory, intact sensory functioning, normal deep tendon reflexes, normal motor functioning, and a normal gait. *Id.* Plaintiff reported that oral medication and her recent rhizotomy were somewhat effective. *Id.*

Plaintiff received a lumbar spine medication injection by Dr. Netherton on December 1, 2008. Tr. at 374. Examination by Dr. Richardson at Palmetto later in December 2008 for low back and neck pain revealed a normal memory, intact sensory functioning, normal deep tendon reflexes, normal muscle strength, and a normal gait. Tr. at 356. Plaintiff reported that oral medication and her recent rhizotomy positively modified her symptoms. *Id.*

Jim Liao, M.D., a state-agency physician, opined on January 13, 2009, that Plaintiff could lift and/or carry 10 pounds occasionally and less than 10 pounds frequently; stand and/or walk at least two hours and sit about six hours in an eight-hour workday; occasionally climb ramps/stairs, balance, stoop, kneel, crouch, crawl, and reach overhead bilaterally; and never climb ladders, ropes, or scaffolds. Tr. at 303–10. Dr. Liao further opined that Plaintiff must avoid even moderate exposure to hazards such as machinery or heights. Tr. at 307. Dr. Liao noted that Plaintiff's allegations of pain down

her legs and into her feet was fully credible based on longitudinal medical evidence and imaging reports. Tr. at 308. He found that Plaintiff's allegations regarding restrictions in bending, lifting, and walking were partially credible. *Id.* Jean Smolka, M.D., a second state agency physician, later concurred with Dr. Liao's assessment of Plaintiff's functional limitations. Tr. at 393–96.

Francis J. Fishburne, Ph.D., examined Plaintiff on January 19, 2009. Tr. at 311–15. Plaintiff reported experiencing marital difficulty, daily depression, and memory difficulty, as well as pain for which medication was somewhat effective. Tr. at 311–12. She denied any side effects from her medications. Tr. at 312. Plaintiff reported caring for her personal needs with effort in some tasks at times, performing light household chores, preparing meals, assuming "full mother's responsibilities for her children[,]" and driving infrequently. *Id.* She stated that her husband and sons shopped and did the housecleaning. *Id.* Examination revealed a depressed mood and below-average judgment, but also a generally full-ranged affect; adequate grooming; normal motor activity; clear, goal-directed thinking; grossly normal attention and concentration; and only mildly impaired short-term memory. Tr. at 313–15. Plaintiff denied significant concentration difficulty. Tr. at 312. Dr. Fishburne diagnosed depression secondary to chronic pain. Tr. at 314.

On January 23, 2009, Michael Neboschick, Ph.D., a state-agency psychologist, opined that Plaintiff had a depressive disorder and generalized anxiety disorder; was moderately restricted in activities of daily living ("ADLs") and maintaining social functioning, concentration, persistence, and pace; and had no episodes of

decompensation. Tr. at 316–29. Dr. Neboschick further opined that Plaintiff could perform simple, repetitive tasks for at least two-hour periods without special supervision; that she could attend work regularly and accept supervisory feedback; and that she would be best suited for a job not involving continuous interaction with the general public. Tr. at 332. Camilla Tezza, Ph.D., later similarly determined that Plaintiff was capable of concentrating and persisting on simple, routine, repetitive tasks; interacting appropriately with coworkers and supervisors; and adapting to work setting changes for simple, routine, repetitive tasks. Tr. at 416.

Examination by Dr. Richardson at Palmetto in January 2009 revealed an abnormal gait and depressed mood, but also that Plaintiff demonstrated a normal affect, normal memory, intact sensory functioning, normal deep tendon reflexes, and normal muscle strength. Tr. at 355.

Plaintiff presented to the Summerville Medical Center ER in February 2009 complaining of back pain and moderate sensory loss in her lower extremities. Tr. at 338–43. She noted that she was past due for a nerve injection. Tr. at 338. On examination, Plaintiff appeared to be uncomfortable and in pain. Tr. at 339. She exhibited moderately limited neck and back ranges of motion, mild back muscle spasm and tenderness, and altered lower extremity position sense, but normal extremity ranges of motion and no motor deficits. Tr. at 339. Providers diagnosed Plaintiff with neck and back pain, acute sciatica with sensory loss, and a herniated disc, but noted that clinical findings did not suggest spinal cord compression. Tr. at 340. Plaintiff was discharged with no changes to her medications and was instructed to follow up with Palmetto the following day. *Id.*

Later that month, Plaintiff received a lumbar spine medication injection by Dr. Richardson.  Tr. at 373.

In March 2009, Plaintiff saw Dr. Richardson at Palmetto complaining of low back and knee pain.  Tr. at 354.  He noted that she was distressed and manic, and that she had an abnormal gait.  *Id.*  He further noted that she demonstrated a normal affect, normal memory, intact sensory functioning, normal deep tendon reflexes, and normal lower extremity muscle strength.  *Id.*  Plaintiff reported that oral medication was somewhat effective.  *Id.*

Plaintiff received a lumbar spine bilateral radiofrequency thermocoagulation by Dr. Richardson in March 2009.  Tr. at 514–15.  An examination in May 2009 revealed findings identical to those of Plaintiff's March 2009 visit.  Tr. at 353.

A mental condition questionnaire completed by a provider at Summerville Family on July 7, 2009, indicates that Plaintiff had an obviously depressed and anxious affect, but was fully oriented with intact thought processes, appropriate thought content, adequate memory/concentration, and adequate memory.  Tr. at 391.

Before Plaintiff's administrative hearing, her counsel submitted deposition testimony (Tr. at 467–78) and a Treating Physician's Statement ("TPS") (Tr. at 486–91) from Dr. Richardson, who had been Plaintiff's treating pain management specialist since November 2008.  Tr. at 468, 486.  In the TPS completed on June 29, 2010, Dr. Richardson expressed that Plaintiff's cervical and lumbar pain would prevent her from being able to perform work at even the sedentary exertional level due to limitations in lifting, carrying, standing, walking, and sitting.  Tr. at 486–88.  Furthermore, Dr.

Richardson assessed seven non-exertional limitations: (1) the need to make "frequent position changes"; (2) the need to take "frequent and/or unscheduled breaks for relief of pain requiring the worker to leave the workstation"; (3) the need to alternate between sitting and standing; (4) the need to elevate legs; (5) no more than occasional neck and head movement; (6) a significant limitation in the ability to concentrate for more than 50% or more of a workday or workweek due to pain, fatigue, depression, and the side effects of prescription medications; and (7) episodes of increased symptoms which would cause work absences four or more days per month. Tr. at 489–91.

In his deposition, Dr. Richardson testified that he did not believe Plaintiff was malingering. Tr. at 471. He explained that Plaintiff's stated symptoms were all consistent with the underlying medical conditions and explained that the absence of MRI evidence showing a nerve entrapment was not inconsistent with the symptoms Plaintiff alleged or the functional limitations he assessed. Tr. at 471–73. Dr. Richardson stated that Plaintiff had discograms showing disc disruption and an annular tear at L4 and L5 and that a leak from a disc could cause radiculitis or nerve pain radiating into an extremity. Tr. at 473–74. With respect to notations made in treatment notes indicating certain negative findings made on clinical examinations (i.e., deep tendon reflexes, strength, sensory, Patrick's test, straight leg raises), he explained that an individual "can still have pain that is debilitating and impairing functional capacity without having a frank functional loss in terms of strength or a reflex." Tr. at 474. Dr. Richardson opined that Plaintiff would be unable to sustain full-time work at even a sedentary job that would allow for sitting and standing at will. Tr. at 477–78.

C.    The Administrative Proceedings

1.    The Administrative Hearing

At the hearing on July 8, 2010, Plaintiff testified that she was temporarily disabled in 2002 after her injury and fusion neck surgery. Tr. at 35. She said that in January 2006, she went back to school and earned her associate degree in certified medical assisting. Tr. at 35–36. She testified that was able to attend classes at a physical campus and was doing "pretty well." Tr. at 38. She stated that after she earned her degree, she attempted to work for a family practice physician, but quit after a few months because she was having severe back pain, swelling and numb feet, and pain radiating into her legs and feet. Tr. at 36–37. She testified that she had not seen any significant improvement since that time. Tr. at 37.

Plaintiff testified that she could not perform an office job because of nerve pain that would shoot from her back down to her legs and feet. Tr. at 39. She also described neck pain that radiated down both arms into her hands and fingers. *Id.* She testified that on a good day, and with pain medications, her pain level is usually a five or six out of 10. Tr. at 39–40. Plaintiff stated that her medications caused short-term memory loss, fatigue, and difficulty with concentration. Tr. at 40. She said she had been unable to do a trial with a spinal cord stimulator because she did not have the money to pay for it. *Id.*

With respect to daily activities, Plaintiff testified that her husband and two sons did most of the chores around the house, but described cooking simple meals occasionally and folding laundry. Tr. at 40–41, 43. Plaintiff explained that she spent most of the time at home in the bed or on the couch, and rarely drove. Tr. at 41, 43.

Plaintiff described watching television, but testified that she could not concentrate enough to read when her pain level was high. Tr. at 41. In describing how often she left the house in a given month, Plaintiff stated that she went to the doctor once a month, tried to go to church about twice a month, went to the store two or three times a month, and tried to visit with her parents, who lived about five miles away, about once every two weeks. Tr. at 42.

2.    The ALJ's Findings

In his August 24, 2010, decision, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant last met the insured status requirements of the Social Security Act on March 31, 2009.

2.    The claimant did not engage in substantial gainful during the period from her amended alleged onset date of November 2, 2007 through her date last insured of March 31, 2009 (20 CFR 404.1571 *et seq.*).

3.    Through the date last insured, the claimant had the following severe impairments: cervical and lumbar degenerative disc disease, depression, and anxiety (20 CFR 404.1520(c)).

4.    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a). The claimant was further limited to no climbing of ladders, ropes, or scaffolds, occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, crawling, and overhead reaching. The claimant was additionally limited to the performance of simple, routine, repetitive tasks.

6.    Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.    The claimant was born on June 17, 1970 and was 38 years old, which is defined as a younger individual age 18–44, on the date last insured (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).
9. Transferability of job skills is not material to the determination of disability because the Medical-Vocational Rules support a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).
10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).
11. The claimant was not under a disability, as defined in the Social Security Act, at any time from November 2, 2007, the amended alleged onset date, through March 31, 2009, the date last insured (20 CFR 404.1520(g)).

Tr. at 18–25.

D.     Evidence Submitted to the Appeals Council

Plaintiff submitted a letter from Dr. Richardson dated October 29, 2010, rebutting the reasons the ALJ gave for rejecting Dr. Richardson's opinion (Tr. at 525–28); Dr. Richardson's treatment records from June 28, 2010 to August 20, 2010 (Tr. at 516–24); and the deposition testimony of vocational expert ("VE") Benson Hecker, Ph.D. (Tr. at 531–58).

Dr. Richardson's rebuttal letter, which was prepared at the request of Plaintiff's counsel (Tr. at 529–30), provides that whether or not a patient was a surgical candidate had "no bearing on whether a patient is a candidate for disability or assessment of functional limitation." Tr. at 526. With regard to the ALJ's citation to a lack of references to acute distress or other clinical findings in the treatment notes and MRIs, Dr. Richardson explained that a patient with chronic pain may not present in acute distress and the lack of an acute event does not discredit a patient's complaint of pain. Tr. at 526. Dr. Richardson stated that a negative straight leg raise is consistent with a disc disorder

and a patient can still have back pain even with such a finding. Tr. at 527. He likewise stated that the absence of motor or sensory deficit does not discredit the presence of neuropathic pain. *Id.*

Dr. Richardson's treatment notes from June 28, 2010, revealed a "quarter-size lesion" had developed on Plaintiff's foot from where she had been scratching due to the burning, itching sensation she had been experiencing. Tr. at 520, 523. Treatment notes from August 20, 2010, revealed Plaintiff had been unable to tolerate new anti-inflammatory medications that had been tried and that she had to postpone a planned trial with a spinal cord stimulator due to financial issues. Tr. at 516–17.

In his deposition, Dr. Hecker testified that the non-exertional limitations assessed by Dr. Richardson "would preclude the performance of basic work-related activities at any level of physical exertion." Tr. at 537. He specifically identified three of the non-exertional limitations that would preclude work at any level of skill or exertion: (1) unscheduled breaks on a frequent basis (Tr. at 537); (2) more than a ten percent impairment in the inability to concentrate, remain alert, and attend to work tasks (Tr. at 537–38, 540–41); and (3) absenteeism of more than two days per month (Tr. at 538, 542–43). Dr. Hecker further explained that simply limiting a claimant to unskilled work would not account for the adverse vocational implications of a significant impairment in concentration. Tr. at 541. Dr. Hecker also testified that there was no correlation between daily activities and the ability to sustain full-time work. Tr. at 543–44. He explained that such activities are performed at one's discretion, while employees are required to perform

at the employer's discretion with regard to productivity, attendance, and the ability to get along effectively with others. Tr. at 544.

II.     Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)      The ALJ improperly rejected the opinion of Dr. Richardson;

2)      The ALJ improperly evaluated Plaintiff's credibility and subjective complaints, including improperly relying on Plaintiff's ADLs; and

3)      The ALJ erred by failing to obtain testimony from a VE.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.      Legal Framework

1.      The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability

claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[2] (4) whether such impairment prevents claimant from performing PRW;[3] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82–

---

[2] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[3] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

## 2. The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v.*

*Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)).  Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence.  "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005).  Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational.  *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964).  If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision."  *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.      Analysis

1.      Treating Physician Opinion

Plaintiff argues that the ALJ did not provide "good reasons" for rejecting Dr. Richardson's opinion.  [Entry #17 at 22–25].  The Commissioner responds that the ALJ properly discounted Dr. Richardson's opinion and provided legally sufficient reasons for doing so.  [Entry #19 at 15].

 If a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record, it will be given controlling weight.  SSR 96-2p; *see also* 20 C.F.R. § 404.1527(c)(2) (providing treating source's opinion will be given controlling weight if well-supported by medically-acceptable clinical and laboratory diagnostic techniques and inconsistent with other substantial evidence in the

record); *see also Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (finding a physician's opinion should be accorded "significantly less weight" if it is not supported by the clinical evidence or if it is inconsistent with other substantial evidence). The Commissioner typically accords greater weight to the opinion of a claimant's treating medical sources because such sources are best able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *See* 20 C.F.R. § 404.1527(c)(2). However, "the rule does not require that the testimony be given controlling weight." *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam). Rather, "[c]ourts evaluate and weigh medical opinions pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson*, 434 F.3d at 654. The ALJ has the discretion to give less weight to the opinion of a treating physician when there is "persuasive contrary evidence." *Mastro v. Apfel*, 270 F.3d, 171, 176 (4th Cir. 2001). In undertaking review of the ALJ's treatment of a claimant's treating sources, the court focuses its review on whether the ALJ's opinion is supported by substantial evidence, because its role is not to "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Craig*, 76 F.3d at 589.

Dr. Richardson issued an opinion on June 29, 2010, in which he opined that Plaintiff's cervical and lumbar pain would prevent her from being able to perform work at even the sedentary exertional level due to limitations in lifting, carrying, standing,

walking, and sitting. Tr. at 486–88. Dr. Richardson opined that Plaintiff could lift less than 10 pounds occasionally or frequently; never bend at the waist; stand, walk or sit less than two hours in an eight-hour workday; and would need the use of a cane for walking on rough or uneven surfaces and for bending or stooping. Tr. at 487–88. Furthermore, Dr. Richardson assessed seven non-exertional limitations: (1) the need to make "frequent position changes"; (2) the need to take "frequent and/or unscheduled breaks for relief of pain requiring the worker to leave the workstation"; (3) the need to alternate between sitting and standing; (4) the need to elevate legs; (5) no more than occasional neck and head movement; (6) a significant limitation in the ability to concentrate for more than 50% or more of a workday or workweek due to pain, fatigue, depression, and the side effects of prescription medications; and (7) episodes of increased symptoms which would cause work absences four or more days per month. Tr. at 489–91.

The ALJ accorded Dr. Richardson's opinion limited weight. Tr. at 22. The ALJ noted that despite Dr. Richardson's statement that Plaintiff could not work full-time, "he has few clinical findings to support such a restrictive assessment." *Id.* The ALJ went on to identify records from February 2010 when Dr. Richardson reported that Plaintiff's muscles were tender to palpation, but Plaintiff repeatedly demonstrated negative straight leg raising with no motor sensory deficits noted. *Id.* In discussing the opinion evidence generally, the ALJ assigned significant weight to Dr. Fishburne's finding that Plaintiff had a global assessment functioning ("GAF") score of 70 and assigned "some weight" to the opinions of the non-examining state-agency physicians who opined that Plaintiff could perform a reduced range of sedentary work. *Id.* Finally, the ALJ cited the routine

and conservative nature of Plaintiff's treatment, the limited objective findings, and repeated examinations revealing normal motor strength, reflexes, tone, and sensation; negative straight leg raising; and no reports of severe, intense, intractable, or disabling pain. Tr. at 23.

As an initial matter, the parties dispute whether Dr. Richardson's opinion, which was rendered over one year after Plaintiff's date last insured ("DLI"), is even relevant to the ALJ's determination. The Commissioner argues that Plaintiff's reliance on the opinion is misplaced because it was rendered well after the DLI. [Entry #19 at 13]. Plaintiff contends that the Commissioner's argument is post hoc rationalization and, in any event, a retrospective opinion may be considered where the opinion relates back to a claimant's pre-DLI status. [Entry #23 at 3–4 (citing *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340–42 (4th Cir. 2012)]. Because the undersigned agrees that the Commissioner's argument is an impermissible post hoc rationalization, it is not necessary to address whether Dr. Richardson's opinion was sufficiently linked with Plaintiff's pre-DLI condition to be considered under the holding in *Bird.*

Plaintiff next contends that "the only medical opinion evidence cited by the ALJ to reject Dr. Richardson's treating physician opinions was a single GAF score . . . and the RFC assessments completed by the non-examining state agency medical consultants." [Entry #17 at 15]. Plaintiff further contends that these opinions did not constitute "good reasons" or substantial evidence for rejecting Dr. Richardson's opinions. *Id.* at 22. Plaintiff's argument fails to recognize that the primary reason cited by the ALJ in discounting Dr. Richardson's opinion was that the doctor's own treatment notes did not

support such restrictive findings. As the ALJ noted, during Plaintiff's visits to Palmetto, she routinely demonstrated normal motor strength, reflexes, tone, and sensation; negative straight leg raising; and no reports of severe, intense, intractable, or disabling pain. Tr. at 23. In so noting, the ALJ specifically considered the supportability of Dr. Richardson's opinion and the consistency of the opinion with the record. *See* 20 C.F.R. § 404.1527(c)(3), (4). A review of the medical records reveals that, other than an abnormal gait, Plaintiff had predominantly normal findings on examination. *See, e.g.*, Tr. at 354–62.

Plaintiff argues that the ALJ improperly interpreted the raw data in her medical records and should have called a medical expert to testify at the administrative hearing. [Entry #23 at 12]. The ALJ did nothing more than review the records and give them their plain meaning. Here, unlike in the cases cited by Plaintiff, the ALJ did not attempt to decipher an MRI or dispute the diagnoses made by the examining physicians. Rather, as ALJs routinely do, the ALJ reviewed the medical evidence and found nothing to support the limitations opined by Dr. Richardson. Plaintiff, in conjunction with submitting Dr. Richardson's opinion to the ALJ and apparently in recognition of the predominantly normal findings in her medical history, submitted Dr. Richardson's deposition transcript. With respect to the normal findings in his treatment notes, Dr. Richardson explained that an individual "can still have pain that is debilitating and impairing functional capacity without having a frank functional loss in terms of strength or a reflex." Tr. at 474. While this may be true, the medical evidence prior to Plaintiff's DLI still lacks support for the extreme functional limitation ascribed to Plaintiff by Dr. Richardson. For this reason, the

undersigned recommends a finding that the ALJ's decision to accord little weight to Dr. Richardson's opinions is supported by substantial evidence.

As a corollary to Plaintiff's argument regarding the ALJ's rejection of Dr. Richardson's opinion, she contends that the ALJ also erred in failing to include the seven non-exertional limitations identified by Dr. Richardson in the residual functional capacity ("RFC") assessment. [Entry #17 at 25]. Based on the foregoing recommendation that the ALJ's decision to accord Dr. Richardson's opinion little weight was based on substantial evidence, the undersigned concludes that the ALJ did not err in failing to include the non-exertional limitations from the opinion in his RFC assessment.

2.     Credibility Assessment

Plaintiff also contends that the ALJ erred in his credibility assessment because he (1) did not address the objective evidence showing dural tears and leakage; (2) did not address Dr. Richardson's explanation of the significance of the medical evidence; and (3) mischaracterized Plaintiff's statements regarding her ADLs. [Entry #23 at 13–14].

Prior to considering a claimant's subjective complaints, an ALJ must find a claimant has an underlying impairment that has been established by objective medical evidence that would reasonably be expected to cause subjective complaints of the severity and persistence alleged. *See* 20 C.F.R. § 404.1529; SSR 96-7p; *Craig*, 76 F.3d 585, 591–96 (4th Cir. 1996) (discussing the regulation-based two-part test for evaluating pain). The first part of the test "does not . . . entail a determination of the intensity, persistence, or functionally limiting effect of the claimant's asserted pain." 76 F.3d at 594 (internal quotation omitted). Second, and only after claimant has satisfied the

threshold inquiry, the ALJ is to evaluate "the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work." *Id.* at 595. This second step requires the ALJ to consider the record as a whole, including both objective and subjective evidence, and SSR 96-7p cautions that a claimant's "statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence." SSR 96-7p, ¶ 4.

If an ALJ rejects a claimant's testimony about her pain or physical condition, he must explain the bases for such rejection to ensure that the decision is sufficiently supported by substantial evidence. *Hatcher v. Sec'y, Dep't of Health & Human Servs.*, 898 F.2d 21, 23 (4th Cir. 1989). "The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, ¶ 5. In evaluating the intensity, persistence, and limiting effects of an individual's symptoms and the extent to which they limit an individual's ability to perform basic work activities, adjudicators are to consider all record evidence, which can include the following: the objective medical evidence; the individual's ADLs; the location, duration, frequency, and intensity of the individual's pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; treatment, other than medication, the individual

receives or has received for relief of pain or other symptoms; any measures other than treatment the individual uses to relieve pain or other symptoms; and any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. SSR 96-7p.

Here, after setting forth the applicable regulations, the ALJ considered Plaintiff's subjective claims under the required two-step process. *See Craig*, 76 F.3d at 591–96. The ALJ found Plaintiff's impairments could reasonably be expected to cause some of the symptoms she alleged, but determined that Plaintiff's testimony "concerning the intensity, persistence and limiting effects" of her symptoms was "not entirely credible to the extent" the testimony was inconsistent with the ALJ's determination of her RFC. Tr. at 21.

Throughout his discussion of Plaintiff's credibility and in his RFC determination, the ALJ noted the limited objective findings to support Plaintiff's alleged degree of limitation. Tr. at 21–24. He noted that medical evidence failed "to reveal any signs of muscular atrophy, strength deficits, circulatory compromise, neurological deficits, muscle spasms, or change in weight, which may be reliable indicators of long-standing, severe or intense pain, physical inactivity, and/or depression." Tr. at 21. The ALJ also noted that the records did not document any complaints by Plaintiff of the significant restrictions she alleges. Tr. at 21–22.

In making his credibility determination, however, the ALJ did not rely solely on the lack of objective evidence. As he is required to do, he cited additional reasons why Plaintiff's testimony was not fully credible. *Mickles v. Shalala*, 29 F.3d 918, 921 (4th

Cir. 1994). He noted that in September 2008, Plaintiff's treating pain specialist, Dr. Netherton, reported that he was very concerned about the validity of Plaintiff's complaints. Tr. at 22. The ALJ also noted Plaintiff's significant range of ADLs including independent personal hygiene, light household chores, folding laundry, preparing simple meals, watching television, reading, shopping for groceries, driving, attending church services, and visiting with family members. *Id.* Finally, the ALJ noted the essentially routine and conservative nature of Plaintiff's treatment and her lack of any psychiatric hospitalization or outpatient mental health treatment. Tr. at 23–24.

Plaintiff first argues that the ALJ erred by failing to consider the objective evidence showing dural tears and leakage. The Commissioner contends that contrary to Plaintiff's assertion, the ALJ expressly and correctly noted that the objective medical findings did not support Plaintiff's alleged functional limitations. [Entry #19 at 22]. As noted above, the ALJ repeatedly referred to the objective findings in his decision, including specific reference to a slight tear at L4–5 revealed on an MRI after Plaintiff's DLI. Tr. at 23. Consequently, the undersigned concludes that this narrow allegation of error is without merit.

Plaintiff next argues that the ALJ failed to properly consider Dr. Richardson's opinions and explanations in assessing Plaintiff's credibility. For the reasons stated above, the undersigned recommends a finding that the ALJ properly discounted Dr. Richardson's opinions; thus, the ALJ's alleged failure to consider them in assessing Plaintiff's credibility is not reversible error.

Finally, Plaintiff argues that the ALJ improperly relied on her ADLs in finding that she was not disabled. [Entry #17 at 27–28]. Plaintiff is correct that evidence of her limited ADLs is not necessarily inconsistent with a finding of disability. *Id.* at 27. However, her argument on this issue suggests that the ALJ's decision was based solely on his consideration of her ADLs. That is not the case. In discounting her credibility, the ALJ considered Plaintiff's ADLs, but also considered Dr. Netherton's concerns about the validity of Plaintiff's complaints, as well as the lack of objective medical evidence to support the alleged severity of her impairments. Furthermore, pursuant to SSR 96-7p, it is appropriate for an ALJ to consider a claimant's ADLs in assessing her credibility. Consequently, the undersigned does not find that the ALJ improperly considered Plaintiff's ADLs.

For the foregoing reasons, the undersigned recommends a finding that the ALJ's credibility assessment is supported by substantial evidence and in compliance with the applicable regulations.

### 3. VE Testimony

Plaintiff's final argument is that the ALJ erred by failing to obtain VE testimony to assess the vocational implications of the seven non-exertional limitations opined by Dr. Richardson. [Entry #17 at 28–30]. Based on the recommended finding the ALJ did not err in failing to include the non-exertional limitations from the opinion in his RFC assessment, the undersigned recommends a finding that the ALJ likewise did not err in failing to obtain VE testimony regarding the alleged non-exertional limitations.

III.     Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the Commissioner, but to determine whether her decision is supported as a matter of fact and law.  Based on the foregoing, the undersigned recommends the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

*Shiva V. Hodges*

October 8, 2013                                Shiva V. Hodges
Columbia, South Carolina                       United States Magistrate Judge

**The parties are directed to note the important information in the attached "Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).